141723 Gloria Garcia v. I.T. W. Smith, Task Force 4. Counsel, you may proceed. May it please the Court, good morning, Your Honors Counsel. My name is Dave Manchetti and I represent the appellant and injured worker in this matter, Gloria Garcia. I think this case is pretty simple. I hope perhaps it's the most simple case that you're going to be deciding this week. As far as I am concerned, there's one and only one issue properly before this Court this morning, and that issue is whether the Commission's decision denying Gloria Garcia an increase in permanent partial disability benefits for loss of use to her arm under Section 8. Is that the only issue? Doesn't the employer have a motion that the appeal should be dismissed? So if we were to grant that motion, we'd never get to the merits of the case, would we? So let's say it's you in reference to their motion to dismiss that the Commission lacked subject matter jurisdiction because your 19-H petition was filed outside, allegedly, the 30-month period allowed by 19-H. First of all, Your Honor, I'd like to respond by saying we believe that all of the issues that were presented were fully briefed, even though there was not a reply brief filed. There is information in the original brief that would allow you to decide this issue regarding the employer's argument regarding jurisdiction based on the time bar. I'd like to explain, perhaps, my reluctance to file a reply brief in the case. Counsel, whether you file a reply brief is your own business. We don't care why you didn't file it. You just didn't. So the briefs are what they are. Yes. So in response to your question, Your Honor, this is the first time the employer is bringing up this issue of the time bar. There were ample opportunities prior to the filing. Is the time limit jurisdictional? It is jurisdictional, is it not? That's correct, Your Honor. So it can't be waived? But it always has to be based on a factual determination about whether, in fact, the filing was time barred. Well, that's it. We want to find out your opinion. You can't just gloss over it. The term is jurisdictional. It's not waived. It's not forfeited. You have to address it. So tell us why it wasn't, why the commission had jurisdiction. The commission had jurisdiction because the second 19-H that was filed, don't forget this case involves a situation where there were two 19-Hs filed. The second 19-H that was filed was certainly filed within 30 months of the commission decision on the first 19-H. And if you look at Section 19-H, it says that a 19-H petition for an increase or decrease in an award can be filed within 30 months of any award of the commission. So your position is simple. The 30-month time limitation set out in 19-H began anew from the day the commission granted the first petition. That's correct. Thank you for giving me the opportunity to explain that, Your Honor. Okay. If you want, Ms. Cavalletti may say something else, and she'll cite a bunch of cases, but we'll get to her. So moving on to the issue that I thought was the only issue properly before the court this morning, that's the issue of whether that denial of the second 19-H is contrary to the manifest weight of the evidence. I was going to take a moment to discuss the procedural aspects of 19-H, but apparently you're familiar with those, so I won't waste time doing that. I would just like to remind you, though, that 19-H is a Section 8 Act that allows for an increase of a prior award, and that's what Ms. Garcia is asking you to do here. And you have to demonstrate, to achieve that, you have to demonstrate a material change in her condition. Is that correct? That is correct, Your Honor. So we acknowledge that the standard for the burden of proof in a 19-H petition may be different than the standard in the underlying case. It's this idea of a material increase. There's no doubt about that. So what are you basing it on? Give us the material, the facts or the evidence that shows there was a material change. So the denial of the petition based on the finding that there was no material increase must be reviewed by this Court under the manifest weight of the evidence here. Correct. But why is that not the case? The reason why that's not the case here, the reason why it's contrary to the manifest weight of the evidence in this particular case, is contrary to some of the other cases that you heard, one case you heard this morning and other cases I know that you heard this week. There is no conflicting medical evidence in that second 19-H hearing. The only medical evidence in that second 19-H hearing was introduced by Ms. Garcia herself. Well, that may be true, but there doesn't need to be conflicting. She has the burden of establishing the material change. And I... Right? Yes, Your Honor. And the denial of the material increase by the Commission is contrary to the manifest weight of the evidence. Why? Because... To get to that point, why? The unrebutted medical evidence, the uncontradicted medical evidence in this case is Dr. Salazar's medical records. And we've included those in the appendix just so you could take a look at that. Are you raising the issue that she has a new diagnosis of adhesive capsulitis? Is that part of what you're arguing? Yes, Your Honor. I'm raising the issue that the new primary diagnosis in this case, since the time of the first 19-H hearing where there was found to be a material increase, there's a new diagnosis. And that new primary diagnosis is adhesive capsulitis. Well, I think that's going to be the real serious contest, because I'm anticipating counsel's going to get up and say, wait a minute. Dr. Cain's medical records demonstrate that by January 31, 23, she had diagnosed her with that same condition, adhesive capsulitis of the right shoulder, and recommended manipulation of the shoulder under general anesthesia, which the claimant declined. So how is that new? Your Honor, the designation that it is the primary diagnosis is what is new. And so, for example, I've included the medical record, its appendix, page 42 of the appendix. You're going to see that Dr. Salazar clearly designates adhesive capsulitis as the primary diagnosis. So my argument is that it is unrebutted that the new primary diagnosis in this case is adhesive capsulitis. Even though she had it before and was treated for it? Yes, Your Honor, because now it's the primary diagnosis. And that, when you consider that to be true. But that doesn't represent a change in her condition if she'd already been diagnosed with that condition. Yeah. I mean, at 19-H, she's got a proof. It is our argument, Your Honor, that it is a material increase when diagnosis is designated as the primary diagnosis, as opposed to being some secondary diagnosis or incidental diagnosis. But the condition is exactly the same. What difference does it make? We believe that the designation of it being a primary diagnosis. Makes the condition different? Yes, Your Honor, it does. How does that make condition? What is different in her existence today because that was primarily as a diagnosis of her affliction today? How has that materially changed from the prior, even though it might have been a collateral diagnosis? It has materially changed because her complaints at the second 19-H hearing before the commissioner were increased. Well, wait a minute. The commissioner found that that wasn't true. They said before she couldn't abduct her, she had shoulder pain and limited abduction of about 90 degrees. And they said she can't abduct her right shoulder more than 90 degrees now without a certificate of pain. No change. She continues to take the same medication that she took at the time of the first hearing. And that before the first hearing, she had pain. She had issues opening the refrigerator, holding, respite. And at the second time, 19-H hearing, she experienced pain no matter what she did. And her restrictions had remained the same as they were before the other hearing. What was different about her condition? The difference was what you just mentioned, Your Honor, where she says she experienced pain, quote, no matter what she did. And we would submit to you that the reason that is is because now the primary diagnosis is adhesive capsulitis. So the adhesive capsulitis you're saying got worse. She got worse because of it. It moved to the primary diagnosis as opposed to some other type of diagnosis. I don't understand how this diagnosis makes any difference. They're not interested in the diagnosis. They're interested in the condition. I mean, she had diagnosis one, and capsulitis was the secondary diagnosis, but her condition was X. And the next one says now she's got capsulitis, that's primary, but her condition is still X. She doesn't get a second 19-H for that because there's a different diagnosis. It doesn't make any difference. It's the condition that we're interested in. What's different about her condition than it was at the time of the first 19-H? Her condition is her credible complaints that she has said have increased since the time of that first 19-H, and that is corroborated by this idea that the diagnosis, the primary diagnosis, is now adhesive. You don't have any cases, do you, that you could point us to that say with the primary diagnosis, where secondary diagnosis becomes the primary diagnosis, that constitutes a material change within the purview of 19-H? Do you have a case that says that? No. No, I do not have a case that is exactly those facts. And along those lines, do you have any doctor's testimony that indicates the significance of changing from a secondary diagnosis to a primary diagnosis along the lines of what you're suggesting here? There was no opinion evidence presented in this case. The only evidence were the medical records. But the medical records, we would argue, are self-evident. Okay. So the medical records which actually record her condition and her testimony, I suppose, as well, right, a material change in her condition now, right? Yes, sir. So, and is that a question of fact for the Commission to decide? If they're from time point A to point B after the second 19-H petition in hearing? It is certainly a question of fact for the Commission to decide. But contrary to some other manifest way cases that you may have heard today, there simply is no contrary medical evidence. If you'll recall what happened in the first 19-H hearing, the employer in the case did present medical evidence. And I'm not saying that it was necessary for them to do so, but all I'm saying is that there was some. No, and I don't think we're even going that way. What we're saying is material change in a condition, what is the evidence there that shows point B today after the petition, the second petition, there is a material change in her condition? Leave out diagnosis, but that there exists. Am I, maybe I'm not being clear. We would submit to you that the material change is her set of complaints. She has said that she is worse since the first 19-H hearing. In fact, as Justice Hoffman has already indicated, she now says that almost anything causes. Wait a minute, what was Dr. Keynes' report of November the 30th, 2004, what he said? Unable to work and had persistent right shoulder problems. Persistent means constant, doesn't it? I don't know that it means constant. It certainly means continuing over a period of time. I don't know that it means constant. Persistent weakness, limitation of motion in her right shoulder. There's no doubt that she had problems. She was awarded an additional 15% loss of use of her arm on that first 19-H proceeding. So there's no doubt that that's the case. How do you respond to this question? In essence, the diagnosis has changed, but the underlying condition hasn't changed. Adhesive capillaries was present before. It's present now. So what condition changed? You're right, the diagnosis may have changed. She apparently won't dispute that, secondary to primary. But what condition is different? What condition is new? What condition changed? I think is what we're wrestling with. Her set of complaints changed. Well, that is different from the day in the 1980s because her set of complaints changed, right? Well, I believe so, Your Honor. I mean, that is evidence of a material change. Her set of complaints changed, especially when they're corroborated by the medical records in which this diagnosis is found. When we're talking about change, why don't we use the word intensified? I think that's really what you're trying to suggest. Absolutely, I am trying to suggest that, Your Honor. I'm just trying to reflect the language that is used in the case law about material change. Well, yeah, I mean, that's a conclusion that came in the case law from a set of facts given either through medical records, testimony, hearsay, whatever was allowed into the record to allow that conclusion to be made. But when the rubber meets the road, is it that something has intensified, there are new manifestations of this condition which was secondary at the first time, 19-H. Now it's, oh, wait a minute, I think it's more primary. In other words, I think the issue is where is that change and why should the commission have found that to be a material change in a factual determination? Certainly the change that I'm talking about is an intensification of the symptoms. Certainly the material change I'm talking about... What symptom was intensified pain? Her whole set of symptoms, Your Honor. Well, she couldn't move her shoulder. They were credible. Her complaints were credible. There was no finding that her complaints were not credible. And as you've already said, Justice Hoffman, at that second 19-H hearing, she is testifying that almost anything she does, almost anything she does causes pain, which is a material intensification or a material change from the prior. Who is to say that shoulder pain is 35% of a man as a whole compared to 42.5% of a man as a whole? Who makes that decision that it's between 35 and 42 or it's more than 35 or less than 42? Who makes that decision? The commission does, Your Honor. I mean, is there some type of an objective scale that they use to make that decision? There's certainly a set of factors that is used by the commission, especially at this time. This was prior to the... Well, when you say there's a set of factors, how would one... What would be the factors that would be different between 35% and 42% of a man as a whole? How would you make that determination? The two main ones, Your Honor, are ones that we've already talked about, complaints and diagnosis. So if I have pain in my shoulder, if I can't move my... I can't abduct my shoulder more than 90 degrees without significant pain on Monday, and I still can't abduct my shoulder more than 90 degrees on Friday, and I have pain at a certain level on Monday and my pain's a little more on Friday, is there a difference between my loss of a man as a whole? Yes, Your Honor, if your pain... Why? Well... That's your position. It certainly is. And, I mean, everything else being equal, some party about an injured worker who has more pain compared to... I mean, if your theory is correct, all you've got to do is file about five more 19-Hs, can't claim my pain is more, we're going to have 100% of the man, we're going to have a permanent total on our hands. Well, it's not that simple because, of course, it's got to be corroborated by the medical records, right? Or at least, you know, uncontradicted by contrary medical evidence, right? Like, you know, you've heard some cases involving surveillance or something like that where the complaints were determined to be non-credible. That's not the case here. Is it possible for two people to have different levels of pain but have the same percentage loss of use of a man as a whole? That's certainly a finding that the commission... Is it possible? Could make, yes. Because... Go on. Okay. Your time has expired. You have time to reply. Thank you. I'd just like to get to my conclusion. For those reasons, we'd ask you to reverse the decision of the circuit court which confirmed the decision of the commission denying the benefits under the second 19-H. Thank you. Thank you, counsel. Counsel, you may respond. Good morning, Justice. Mr. Michetti, Elizabeth Capoletti on behalf of the appellee. So obviously I need to address the subject matter of jurisdiction, and I'm sure the case you're all aware of now. But you don't need to believe me. If you don't, you're going to talk about Harden, Simon. You're going to try and hang your head on Bay. Hang my head on what? Bay, the Bay case. No, actually I'm not. You didn't sign any of those cases, did you? Harden, Simon or Bay? I agree. And I read them. I read them in conducting my research, and I read them again today, and I should. There's no question about it. Harden, Simon pretty clearly allows this, right? Well, it has very broad language. There's no question. But I do think it's fundamentally different. And let me tell you what. I do think the facts are fundamentally different, and because of those fundamentally different facts, the reasoning used by the court to get to the decision is fundamentally different. In Harden, Simon, the employee injured his shoulder just like here. He had a hearing, was awarded PPD benefits. And then within the 30 months, he came back in and he filed a 19-H. And the court said that was okay, right? Pardon me? The court said that was okay in Harden, right? And that's fine, but look, it's that 19-H we have to talk about because that 19-H only asked for TTD. It only asked for TTD. And medical. In that one, AA medical. But it only asked for TTD. So his condition had destabilized. There was no question. He was at an unstable condition. He needed more treatment. He was off work. He needed TTD. So once his condition stabilized, he certainly came back in for that second 19-H, which was beyond the 30 months. And the court, in reasoning, said, look, it would have been pure speculation for the commission to make a determination of PPD benefits at the time of that first 19-H hearing. There was no way for them to do it because his condition had destabilized. It was speculation. Therefore, yeah, we're going to toll that 30 months to allow him that time period to come back into court and say, hey, now my condition has stabilized and I'm entitled to more PPD benefits. There has been a material change in my condition. And I want to think why I thought, my thought process was, after Harding & Sign Company, there was 10 years of case law really defining the different standards under 19-H as it relates to requesting TTD benefits versus permanency benefits. Because in Briggs, initially they looked at it and said, hey, no, you don't get TTD unless you can show material change in PPD benefits. Was there anything in Harding's analysis, putting aside the factual differences between Harding and this case, was there anything in the Harding court's actual analysis that would support your interpretation of the limitations you're seeking to impose here? Yeah, and that's what I'm saying is because it was very significant that the first hearing only related to TTD. That's the factual distinction I'm talking about. But what I'm wanting you to hone in on is the analysis that the court employed. Did they say something that would lead us to believe that it should be more narrowly interpreted along the lines of what you're suggesting? Well, when they talk about it and when they come to their conclusion, they specifically address, they say, in the first 19-H petition, claimants sought additional temporary total disability compensation as well as medical. And then in their analysis they go on, it is our conclusion that 19-H of the Act mandates additional review of the award to encourage the spirit of the Act, further such mention of determination of a claimant's disability, and eliminates the most difficult problem in attempting to anticipate the progression of the claimant's disability. I mean, they were very concerned with the fact that the commission at that time of that first 19-H hearing could only look to TTD benefits because he hadn't stabilized. But that's not really what the Act says. You look at an increase in condition as it relates to the condition at the time the 19-H is filed, vis-à-vis the condition. But because the Act says it's within 30 months of any award, it doesn't talk about what that has to be. And then they get to review it within 30 months, either request from an employer or an employee, on the ground that the disability of the employee has subsequently increased, diminished, or ended. So the fact that the first 19-B may have been based on TTD alone, and the condition didn't change, they get the TTD or whatever they get, but the second 19-H filed within 30 months of the first 19-H is going to start comparing the condition at the time of the second award. Well, the second award condition was the same as when the original award was granted, but there was a 19-H and they did enter an award, so now he says his condition's changed. Why isn't that within the wording of the Act? Because I think that that's the whole point of Section 19-H, was we want finality in decisions, right? I mean, we do want it, but the legislators said, hey, well... Well, 19-H is the antithesis of finality. Exactly. But they made a determination that, hey, we will give you 30 months. We'll give you 30 months in which to come back in here and say, hey, you've had your final say in court, but we'll give you another 30 months to come back in and say, hey, I think something went wrong in these last 30 months and my condition has destabilized, but now it's gotten to the point that it's materially changed. Obviously, this is an Act written by man with ambiguity in the language of symbolism, and whenever you hear a court talking about spirit, okay, you can guarantee yourself that it's going to be a case-by-case basis determination. That's the reality of the world today. And it's not wrong for the court to say award means this. If the legislature wants to say award, original award, at the conclusion, they're perfectly free to do it, and I'm sure there's many interest groups, particularly today in Springfield, that would like to add that language. And until that time, I think the case law suggests the other way. I guess I was just trying to explain to you why I thought that Harden's sign wasn't as broad. Well, it's a good argument. It's a good argument. We have two different standards here now for TTD and PPD, which wasn't exactly relevant. That didn't exist back in 1987. Is there a case that says you can't file a second 19-H within 30 months of the first 19-H award? Well, Bain says if you've lost, you can't do it again, right? No. I can't tell you that. No, there is a case that says you can. Klein signed it wrong. You want to move to the next? Okay. No, no, no, I understand. I just wanted to explain to you what my thought process was, why I didn't think that language was quite as broad. And you did. So let me go on to the merits of the case. There's been lots of discussion about pain and whether or not this pain has changed. You're talking about whether the diagnosis went from secondary to primary, if that carries today in your opinion. No, and I'm not quite sure where that comes from. Tell us why not. Well, one, I'm not even sure there is this primary-secondary diagnosis that's changed from adhesive capsulitis being now the primary. Because I was looking actually at the medical records in the appellant's appendix. And if you look, there's a progression of the claimant going to see Dr. Salazar throughout a time period. And if you look, I think it's page 705 on the record, he lists out an assessment. And the first one is osteoarthritis. And then the second one is back pain. And the third one is low back pain. And then the fourth one is adhesive capsulitis. So if you look at these records at different time periods, it does change back and forth between what's listed as first, second, third. Does that just simply demonstrate a waxing and waning of the other conditions as opposed to the adhesive capsulitis deteriorating? Correct. And that's why I'm saying I'm not quite sure where this question came up that it's the primary diagnosis. Now, I'm not sure where that is in the records. These are factors that go into a 19-H, whether it's your 50th one or your first one. Okay? And the two factors are complaint and diagnosis. And diagnosis is from secondary move to primary. But I think probably and suggested is the material change is really complaint. Correct. And so where are we from your position in terms of a material change in complaint, which is symptomology and condition? Sure. And or pain. Right. Can pain, can increases in pain, in answering Justice Holder's questions, can severe increases in pain carry the day under 19-H, where the condition is relatively simple? Well, no, I don't believe it can. It's a general overarching role. And second, I don't believe that's what, more importantly, that's not what happened here. In 2004, the claimant testified, and I have this on page 52 of the record, yes, in my shoulder, but it don't matter what I am doing. So the pain is, it stays there no matter what. And that was her testimony in 2004. As of the first hearing, her testimony was my pain is unrelenting no matter what I do. She just said, you just read what she said. Don't edit it. Okay. That's the evidence. That's the evidence. Okay. Now, what do you have in evidence now at the second 19-H? So in 2008, the first, she says, so. Is this the first 19-H? Yeah, this is the first question. So even if you're not doing any evidence. Second 19-H. You are in constant pain. Yes. I mean, yes. That's on page 387. That's 2008. And in 2012, the witness, I feel the pain. It don't matter what I try to do. If I'm going to reach something, I can feel the pain immediately in my right shoulder. Her testimony is completely consistent from 2004 to 2008 to 2012, the last 19-H hearing. The testimony has always been constant pain. No matter what I do, I'm in constant pain. There's no change relative to the pain. Relative to the movement in her shoulders, the 90 degrees, inability to abduct her shoulder beyond 90 degrees without pain, that existed in 2003, long before the first 2004 hearing. That was the same finding. Those findings have never changed. And then in 2003, Dr. Cain did diagnose the claimant with adhesive capillitis. Dr. Cain recommended surgery, and the claimant declined that surgery. That was all in 2003, long before the first original hearing in 2004. And in that, the commission noted in its original decision that the claimant suffered from adhesive capillitis, that she had been diagnosed with it, that surgery had been recommended, and that she declined the surgery. That was from 2003, and that's what they noted in their decision of 2004. So there has been absolutely no change in her condition between 2004, 2008, and 2012. So therefore, you believe there's sufficient evidence to support the commission's denial, correct? Correct, I do. And I would ask that the commission's decision denying the 19-H petition be affirmed. Thank you. Thank you, counsel. Counsel? Okay, very well. Thank you, counsel, both, for your arguments in this matter this morning. It will be taken under advisement, and a written disposition shall issue.